UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 08-67-P-H |
| | ) | |
| STANLEY JENKINS, | ) | |
| | ) | |
| Defendant | ) | |

RECOMMENDED DECISION ON MOTION TO SUPPRESS

Defendant Stanley Jenkins, charged in a multi-defendant indictment with one count of conspiracy to distribute, and possess with intent to distribute, controlled substances, including 50 grams or more of a mixture or substance containing cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One), two counts of distributing five grams or more of a mixture or substance containing cocaine base, and aiding and abetting in such conduct, in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2 (Counts Two and Three), one count of conspiracy to engage in firearms dealing without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D) (Count Six), one count of conspiracy to make false statements to a licensed federal firearms dealer in connection with the acquisition of firearms, in violation of 18 U.S.C. § 922(a)(6) (Count Seven), and one count of making a false written statement to a gun shop, in violation of 18 U.S.C. §§ 922(a)(6), 924(a)(2), and 2 (Count Eight), *see* Second Superseding Indictment (Docket No. 12), seeks to suppress evidence seized pursuant to a state search warrant issued on January 16, 2008, *see* [Motion To Suppress] (Docket No. 99) & Affidavit and Request for a Search Warrant/Affidavit of Agent Ernest W. MacVane III ("MacVane Aff."), attached thereto.  For the reasons that follow, I

1

recommend that the Motion To Suppress be denied.

## I. Facts

On January 16, 2008, Ernest W. MacVane III, a Windham, Maine, police officer assigned since January 2004 as a task force agent for the Portland, Maine, office of the federal Drug Enforcement Administration ("DEA"), applied to the State of Maine District Court for a warrant to search, *inter alia*, the residence of Darryl Frederick at 1 Cleaves Street, Unit No. 205, in Old Orchard Beach, Maine ("Unit 205"), which MacVane described as occupied by a black male using the alias "Stix." *See* MacVane Aff. at 1, 3.

MacVane stated in his affidavit submitted in support of the warrant application that he had developed probable cause to believe that owners, occupants, and residents of Unit 205 had committed violations of Maine's criminal drug laws and that evidence of those violations would be found therein, *see id*. at 8-9, based, *inter alia*, on the following facts and circumstances:

1. On "01-16-2007," he spoke on the telephone with a source of information ("SOI") who told him that a tall, skinny black male with frizzy hair, who went by the name "Stix," was selling four to five ounces of cocaine base per week from his Old Orchard Beach condominium, located at the Sea Watch Condominium ("Sea Watch") in the last building on the right on Cleaves Street. *Id*. at 6, ¶ 12. The SOI had an extensive criminal history and was a convicted felon, although he/she was not then facing any criminal charges of which MacVane was aware. *Id*. at 6 n.2. No promises had been made to the SOI, but he/she expected, reasonably in MacVane's view, to be compensated for providing information to law enforcement officers. *Id*.

2. The SOI told MacVane that he/she had visited outside of Stix's apartment and knew it to be on the second floor near the elevator. *Id*. at 6, ¶ 12. The SOI stated that although he/she had

never been inside of Stix's apartment, he/she had been in the company of individuals who had visited it for the purpose of purchasing cocaine base and who had actually purchased cocaine base there during the past couple of weeks. *Id*.

    3.    On "01-16-2007," MacVane and another officer, Detective Foshay, established surveillance of the Sea Watch complex and observed a tall black male with frizzy hair, wearing red sweat pants and a white t-shirt, peering out from inside a unit near the area described by the SOI as the location of Stix's apartment. *Id.* at 6, ¶ 13.

    4.    Later that afternoon, special agent William Eldridge observed four to five men on the balcony of the apartment in which MacVane and Foshay had seen the male resembling Stix. *Id*. at 6, ¶ 14. Eldridge observed the men chatting and smoking an unknown substance. *Id*.

    5.    At about 2:35 p.m., special agent David Bruni observed a dark-colored passenger car depart the Sea Watch. Eldridge also reported observing that vehicle and recognized its operator as one of the black men visiting on the balcony with the male resembling Stix. *Id*. at 6, ¶ 15. Foshay and MacVane followed the vehicle as it traveled into Scarborough, Maine, witnessing its driver commit several traffic law violations. *Id*. The vehicle eventually was stopped by uniformed officers of the Scarborough Police Department, among them canine officer Michael Sawyer. *Id*. at 6, ¶ 16. Sawyer identified the car's driver as Alvaro Cuesta. *Id*. Sawyer told MacVane that his dog alerted him to the presence of controlled substances in the vehicle's passenger compartment and on Cuesta's person, but a search revealed no drugs or contraband. *Id*. at 7, ¶ 16. Sawyer informed MacVane that his dog would indicate for controlled substances if Cuesta previously was in possession of such substances or had been in the presence of someone using them. *Id*.

    6.    Later that afternoon, at about 3:40 p.m., Foshay and MacVane observed a charcoal-

colored passenger car driven by a white female, with a black male passenger, arrive at the Sea Watch. *Id*. at 7, ¶ 17. MacVane observed the male leave the vehicle and walk to the condominium's entrance, leaving the female in the vehicle. *Id*. About five minutes later, he saw the male reenter the vehicle, which departed and headed in the direction of Saco, Maine. *Id*. Foshay and MacVane followed the vehicle and observed the driver violate several traffic laws. *Id*. At MacVane's and Foshay's request, uniformed officers of the Old Orchard Beach Police Department eventually located and stopped the vehicle for those reported traffic violations. *Id*. at 7, ¶ 18. MacVane approached the passenger side of the vehicle and asked the passenger for his name and identification. *Id*. The passenger gave his name as "Greg." *Id*. MacVane could smell marijuana and observed a partially smoked marijuana cigarette in the passenger's side armrest. *Id*.

       7.      MacVane ordered "Greg" from the vehicle and identified him as Gregory Odom. *Id*. at 7, ¶ 19. A check with the Department of Motor Vehicles revealed that Odom was on bail conditions, among them submission to random search. *Id*. MacVane told Odom he was going to search him and asked if he had any drugs on him. *Id*. Odom confirmed that he did and relinquished about seven grams of cocaine base from his jacket sleeve. *Id*. MacVane arrested Odom for trafficking in Schedule W drugs and for violation of bail conditions. *Id*. The substance turned over by Odom later field-tested positive for the presumptive presence of cocaine. *Id*.

       8.      Odom was taken to the Old Orchard Beach Police Department, where he agreed to waive his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966), and speak to MacVane. *Id*. at 7, ¶ 20. In his affidavit, MacVane stated that Odom told him:

> i.      That he has been using controlled substances since age 17, and has been using cocaine base for about 1 year.

      ii.      That he has been purchasing marijuana and cocaine base from a black male named STYX for the past 6 months, more specifically that he has been purchasing cocaine base from STIX at 1 Cleaves Street unit number 205 for the past week.

      iii.      . . . that he has observed firearms, specifically pistols[,] "laying around" the apartment and that he has observed these firearms on more than one occasion.

      iv.      . . . that today (01-16-2008) he traveled to STIX['s] apartment at 1 Cleaves Street Unit 205 with his girlfriend Christina ABDILL; while there he purchased about 7 grams of cocaine base for $200.00 from an unknown female.

      v.      . . . that a portion of this cocaine base was fronted (provided on credit) to him and that he owes STIX $200.00 for the additional quantity.

*Id*. at 8, ¶ 21 (footnote omitted).

    9.    On "01-16-2008," MacVane spoke with Matt Nadeau, deputy sheriff of the York County Sheriff's Office, who told him that he had received information from a reliable source that "Stretch," also known as "Stix," was known to carry two 50-caliber Desert Eagle handguns for protection and that this source previously observed Stix with those firearms on Pearson's Lane in Biddeford in November 2007. *Id*. at 8 n.2.

    10.    At about 4 p.m., Foshay spoke with the property manager of the Sea Watch, whose records listed Darryl Frederick as the occupant of Unit 205. *Id*. at 8, ¶ 22. The building manager also told Foshay that she had received numerous complaints about heavy pedestrian traffic in and out of Unit 205 for brief visits. *Id*. The property manager confirmed that the unit described by Foshay was in fact Unit 205. *Id*.

    A Maine District Court judge signed the affidavit on January 16, 2008, at 8:05 p.m. *Id*. at

5

10.[1]

Mention is made of the defendant's connection to Unit 205 in several reports of investigations by a Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") agent, including the following:

1. "SA [Special Agent] Crowley outfitted the CI [Confidential Informant] with electronic monitoring devices and instructed him/her to proceed to the residence [of] JENKINS and LEARY at 1 Cleaves Street apt. #205 in Old Orchard, ME . . . ." Report of Investigation Number 19 by Thomas F. Crowley dated January 11, 2008, Exh. 1 to [Motion To Seal, Motion To Supplement] ("Motion To Supplement") (Docket No. 121), ¶ 3.

2. ". . . STANLEY JENKINS is staying in apartment 205 at the Sea Watch Condominiums located at 1 Cleaves Court in Old Orchard . . . ." Report of Investigation Number 21 by Thomas F. Crowley dated January 17, 2008, Exh. 2 to Motion To Supplement, ¶ 2.

3. ". . . DAVIS and an unidentified white male were observed leaving his residence in Freeport, ME and driving to JENKINS' residence [i]n Old Orchard, ME . . . ." Report of Investigation Number 23 by Thomas F. Crowley dated January 28, 2008, Exh. 3 to Motion To Supplement, ¶ 3.

4. "It should be noted that a few weeks ago a search warrant was executed at STANLEY JENKINS' apartment in Old Orchard Beach, Maine." Report of Investigation Number 30 by Thomas F. Crowley dated February 12, 2008, Exh. 4 to Motion To Supplement, ¶ 3.

---

[1] The Maine District Court judge signed to indicate that MacVane had personally appeared before him and had sworn to the truth of the MacVane Affidavit. *See* MacVane Aff. at 10. The defendant supplies no other documentation, but the government represents, and the defendant does not contest, that the state court judge issued the warrant. *See* Government's Objection to Defendant's Motion To Suppress Evidence ("Objection") (Docket No. 111) at 3; Reply to Government's Objection to Defendant's Motion To Suppress Evidence ("Reply") (Docket No. 118).

5.      "[REDACTED] and JENKINS were then escorted down to the living room at which time JENKINS stated that his name was DARRYL FREDRICK, who is a known associate of JENKINS and in whose name the apartment in Maine was rented . . . . After some conversation, JENKINS admitted that DARRYL FREDRICK was an alias and confirmed his identity." *Id*. ¶ 4.

## II. Discussion

The defendant seeks to suppress evidence seized from Unit 205 on the ground that the MacVane Affidavit did not convey probable cause to believe that a crime had been committed or that evidence relevant to the probable criminality likely would be located at the place to be searched. *See* Motion To Suppress at 1-5. Specifically, the defendant argues that probable cause was lacking because MacVane supplied stale information (describing events that had occurred a year earlier, on January 16, 2007) and relied solely on the report of the SOI without offering information tending to show that the SOI was reliable or independently corroborating his/her report. *See id*. at 3-5. He adds that the so-called *Leon* good-faith exception is unavailable to the government, assuming that the government asserts that the references to 2007 (rather than 2008) were typographical errors, because the reviewing judge's failure to pick up on such "glaring" and material errors, going to the heart of the probable cause determination, calls into serious question whether he ever even read the affidavit. *See id*. at 7-8; *see also United States v. Leon*, 468 U.S. 897, 923 (1984) (good-faith exception to exclusionary rule in cases in which officers rely on search warrant not available when, *inter alia*, "the issuing magistrate wholly abandoned his judicial role").

The government counters that (i) the defendant fails to establish that he had any reasonable expectation of privacy in the premises searched, thus foreclosing the instant challenge, (ii) in any event, the MacVane Affidavit conveyed probable cause for issuance of the warrant, and

(iii) alternatively, the *Leon* good-faith exclusion applies. *See* Objection at 3-7.

In response, the defendant points to passages from the ATF reports quoted above, which he contends demonstrate that he did have sufficient ties to Unit 205 to challenge the instant search and seizure. *See* Reply at 1-4.

I find that the defendant establishes his standing to challenge the search of Unit 205 and the seizure of evidence therefrom, but conclude that he falls short of sustaining his burden as movant to show that the warrant was issued without probable cause.

### A. "Standing": Reasonable Expectation of Privacy in Unit 205

As the First Circuit has explained:

> Before reaching the merits of a suppression challenge, the defendant carries the burden of establishing that he had a reasonable expectation of privacy with respect to the area searched or, as in this case, the items seized. While the Supreme Court noted that this threshold analysis is more properly placed within the purview of substantive Fourth Amendment law than within that of standing, courts continue to refer to it as an issue of "standing."

*United States v. Lipscomb*, 539 F.3d 32, 35-36 (1st Cir. 2008) (citations and internal quotation marks omitted). "To qualify under this mantra, a privacy expectation must meet both subjective and objective criteria: the complainant must have an actual expectation of privacy, and that expectation must be one which society recognizes as reasonable." *Vega-Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 178 (1st Cir. 1997); *see also, e.g., United States v. Gray*, 491 F.3d 138, 145 (4th Cir. 2007) ("To be legitimate, an expectation of privacy must be objectively reasonable: it must flow from a source outside of the Fourth Amendment, either by reference to concepts of real or personal property or to understandings that are recognized and permitted by society.") (citations and internal quotation marks omitted).

"[N]ot every visitor merely present with the consent of the householder has a legitimate expectation of privacy." *Gray*, 491 F.3d at 145 (citation and internal quotation marks omitted). "It is rather a foundational principle that not all persons in the company of the property owner have the owner's right to assert the spatial protection." *Id*. (citation and internal quotation marks omitted). Nonetheless, at least one class of visitor has clearly been recognized as possessing a legitimate expectation of privacy in another's home: overnight guests, *see, e.g., Minnesota v. Olson*, 495 U.S. 91, 98 (1990) ("To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share."); *United States v. Jiménez*, 419 F.3d 34, 40 (1st Cir. 2005) ("an overnight guest has an expectation of privacy in the home in which he is staying").

The defendant demonstrates that he was, at the least, an overnight guest at Unit 205 and therefore harbored a legitimate expectation of privacy in those premises. The MacVane Affidavit and the ATF reports reveal that agents personally observed the defendant to be residing at Unit 205 for a period of some weeks and also received information from others indicating this to be the case. While it is true, as the government points out, *see* Objection at 3-4, that the Supreme Court held in *Minnesota v. Carter*, 525 U.S. 83 (1998), that temporary guests present for the sole purpose of drug sales did not have a reasonable expectation of privacy in those premises, *see Carter*, 525 U.S. at 90-91, the instant case is distinguishable. In *Carter*, the respondents "were obviously not overnight guests, but were essentially present for a business transaction and were only in the home a matter of hours." *Id*. at 90. Even if the defendant made commercial use of Unit 205, he also had been residing there for a period of some weeks. Thus, he harbored an objectively reasonable expectation of privacy in those premises. *See, e.g., United States v. Cross*, No. 01-20020 G/BRE, 2001 WL

9

1830146, at *5-*6 (W.D. Tenn. Oct. 12, 2001) (defendant's presence at residence was not of a purely commercial nature, as in *Carter*, when he had familial ties with the building's owner, was permitted to use common facilities for bathing, occasionally stayed overnight with a friend who rented one of the rooms, had a key to the room searched, and was permitted to be in the room even when his friend, the renter, was away). The defendant demonstrates that he harbored an objectively reasonable expectation of privacy in Unit 205; accordingly, his Fourth Amendment challenge to the search of those premises, and seizure of items within, may proceed.[2]

### B. Probable Cause for Warrant

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched – the so-called 'nexus' element." *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005) (citation and internal quotation marks omitted). "In determining whether the nexus element is satisfied, a magistrate has to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 48-49 (citation and internal punctuation omitted). "Put differently, the application must give someone of 'reasonable caution' reason to believe that evidence of a crime will be found at the place to be searched." *Id*. at 49.

A defendant bears the burden of proving the illegality of a warrant; if he succeeds, the burden shifts to the government to prove entitlement to the *Leon* good-faith exception. *See, e.g., United*

---

[2] As the defendant points out, *see* Reply at 1-2 n.1, a defendant may offer proof of connection to premises for purposes of demonstrating "standing" but seek to distance himself or herself from those premises at trial, *see, e.g., United States v. Samboy*, 433 F.3d 154, 162 (1st Cir. 2005). "[E]vidence used to establish 'standing' to raise [a] Fourth Amendment claim cannot be used as direct evidence at trial to establish guilt or innocence[.]" *Id*.

*States v. Longmire*, 761 F.2d 411, 417 (7th Cir.1985) ("The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality."); *see also, e.g., United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002) ("If a defendant is successful in establishing the invalidity of the search warrant, the burden then shifts to the Government to establish that the police relied in good faith on the judge's decision to accept the affidavit and issue the warrant.").

Both the issuing magistrate and a subsequent reviewing court look to "the totality of the circumstances indicated [within the four corners of] a supporting affidavit" to assess the existence *vel non* of probable cause, "[y]et such review cannot start from scratch." *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir. 1996) (citation and internal quotation marks omitted). "A reviewing court must give great deference to a magistrate's assessment of the facts and inferences supporting the affidavit . . ., reversing only if there is no substantial basis for concluding that probable cause existed." *United States v. Sawyer,* 144 F.3d 191, 193 (1st Cir. 1998) (citation and internal punctuation omitted).

### 1. Staleness

The defendant argues that MacVane conveyed stale information because all of the events he discussed occurred on January 16, 2007, one full year before he applied for a warrant, and "[n]o other information from any more current dates is mentioned." Motion To Suppress at 4. As the government notes, *see* Objection at 6, this observation is incorrect. Although MacVane twice mentioned the date "01-16-2007," he also indicated that Odom had traveled to purchase drugs at

11

Unit 205 "today (01-16-2008)," the day of application for the warrant. MacVane Aff. at 8, ¶ 21. Given the tight temporal sequence laid out in MacVane's affidavit, *see id*. at 6-8, ¶¶ 12-22, culminating in Odom's post-*Miranda* statement, and the timing at the beginning of a new year, when people commonly mistakenly continue to use the prior year in dates, it seems evident that the first two references to "01-16-2007" were typographical errors. So construed, the affidavit conveyed nothing but fresh information.

In any event, as the government argues, even if one assumes that MacVane spoke to the SOI on January 16, 2007, the affidavit indicates that Odom purchased cocaine at Unit 205 "today" on January 16, 2008.[3] Thus, MacVane offered same-day corroboration of the existence of an ongoing drug trafficking enterprise, even if one assumes that the enterprise was first known to have existed a year earlier. Year-old information suggestive of drug trafficking, freshened by same-day corroboration of the same, is not stale. *See, e.g., United States v. Feliz*, 182 F.3d 82, 87 (1st Cir. 1999) (three-month-old evidence of drug transactions not stale; "courts have upheld determinations of probable cause in trafficking cases involving similar or even longer periods"); *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old evidence of existence of marijuana-growing venture not stale); *United States v. Reiner*, 382 F. Supp.2d 195, 198-99 (D. Me. 2005) (given existence of advertisements contemporaneous with warrant application suggesting that health club was engaged in business of prostitution, "slightly more distant but still recent historical data [suggesting the same] were also relevant.") (footnote omitted).

---

[3] The government represents that the two references in the affidavit to "01-16-2007" are typographical errors and that, in fact, the underlying events occurred on January 16, 2008. *See* Objection at 1-3 & n.1. However, it states that "because the typographical error is not obvious from the face of the affidavit," it assumes for purposes of analysis that MacVane's conversation with the SOI transpired on January 16, 2007. *See id*. at 4 n.2.

## 2. Corroboration

The defendant further argues that the MacVane Affidavit failed to convey probable cause because, although "MacVane's entire premise for this search warrant stems from one conversation with one SOI," MacVane provided no information tending to verify the SOI's reliability or corroborate the substance of his/her hearsay statements. *See* Motion To Suppress at 4-5. As the government points out, this argument, as well, is built on a faulty factual foundation. *See* Objection at 5. The affidavit makes clear that MacVane did not simply take the SOI at his/her word. Instead, he and other agents set up surveillance at the Sea Watch, making observations consistent with the SOI's report of cocaine trafficking, including sightings of a brief visit to Unit 205, a canine search indicating that one individual observed departing the unit had been in the presence of controlled substances, and, most importantly, the discovery of cocaine base on Odom following his departure from Unit 205 and his confession that he had purchased the cocaine base on January 16, 2008, from someone in that unit.

These efforts sufficed to corroborate the SOI's statements. *See United States v. Jordan,* 999 F.2d 11, 14 (1st Cir. 1993) (reliability of confidential informant's hearsay statements "may be corroborated by various means, including direct surveillance or circumstantial evidence, or vouchsafed by the affiant") (citations omitted). The totality of information conveyed in the affidavit, both from the SOI and from agents' own surveillance, sufficed to establish probable cause to believe that a crime (cocaine trafficking) had been committed, and that fruits of that crime likely would be found in the place to be searched (Unit 205). No more was required.

### 3. *Leon* Good-Faith Exception

A finding that the warrant to search Unit 205 was supported by probable cause is dispositive

of the defendant's motion to suppress. However, even assuming *arguendo* that there was no substantial basis for concluding that probable cause existed, I would reach the same result based on application of the *Leon* good-faith exception, pursuant to which "[e]vidence seized in violation of the Fourth Amendment is admissible in court if the government placed an objectively reasonable reliance on a neutral and detached magistrate judge's incorrect probable cause determination." *United States v. Crosby,* 106 F. Supp.2d 53, 58 (D. Me. 2000), *aff'd*, 24 Fed. Appx. 7 (1st Cir. 2001) (citation and internal quotation marks omitted).

As the defendant suggests, *see* Motion To Suppress at 7, the *Leon* exception is itself subject to exceptions:

> There are four exclusions to the *Leon* good-faith exception: (1) when the magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his detached and neutral judicial role; (3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where a warrant is so facially deficient – i.e. in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid.

*United States v. Owens*, 167 F.3d 739, 745 (1st Cir. 1999) (citation and internal punctuation omitted). The defendant invokes the second of these exceptions, suggesting that, if in fact MacVane's references to the year 2007 were typographical errors, the issuing judge's failure to pick up on those glaring, material errors, going to the heart of the probable cause determination, calls into serious question whether he ever even read the MacVane Affidavit. *See* Motion To Suppress at 7-8.

This argument, too, falls flat. For the reasons explained above, the affidavit reasonably could have been read to convey probable cause for the requested search even if the issuing judge took MacVane's references to the year 2007 at face value. Thus, the issuing judge's failure to notice or

14

correct the typographical errors, in itself, hardly indicates that "the issuing magistrate wholly abandoned his judicial role" as a detached and neutral judicial officer. *Leon*, 468 U.S. at 923. Accordingly, even assuming *arguendo* the absence of probable cause to support the warrant, the *Leon* exclusion applies.

### III.  Conclusion

For the foregoing reasons, I recommend that the Motion To Suppress be **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 29th day of September, 2008.

/s/  John H. Rich III  
John H. Rich III  
United States Magistrate Judge